# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 2, 2026

Lyle W. Cayce
Clerk

_____

No. 25-10619

_____

Neil McDougall,

*Plaintiff—Appellant*,

*versus*

Saudi Arabian Oil Company, *doing business as* Saudi Aramco,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:24-CV-2564

_____

Before King, Southwick, and Haynes, *Circuit Judges*.

Per Curiam:*

Plaintiff–Appellant Neil McDougall sued Defendant–Appellee Saudi Arabian Oil Company for fraud. The district court dismissed the case, concluding that it lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act and that neither the commercial-activity nor the expropriation exceptions thereto could save McDougall's claims. We agree and AFFIRM.

_____

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-10619

# I

In 2012, Neil McDougall, then residing in Ontario, Canada, received an offer to work as a Planning/Analysis Specialist for Saudi Arabian Oil Company ("Saudi Aramco"), an energy company owned by the Kingdom of Saudi Arabia.

Importantly, the job offer was not sent by Saudi Aramco, but by Aramco Services Company ("ASC"), Saudi Aramco's subsidiary based in Houston, Texas. The offer letter stated that Saudi Aramco "ha[d] asked [ASC] to conditionally offer [McDougall] the position of Planning/Analysis Specialist with Saudi Aramco." The letter also required McDougall to "work closely with the ASC processing staff to promptly satisfy [certain] contingencies," such as a background investigation and a physical examination "satisfactory to Saudi Aramco," "according to the timetable established by ASC." McDougall also alleges that, in addition to these recruiting and human-resources functions, ASC also aids Saudi Aramco in "oil distribution, oil refining, and research in Texas and the United States more broadly."

McDougall accepted the offer of employment and relocated to Saudi Arabia. And for the next several years, McDougall's employment contract renewed automatically year-to-year. In March 2020, still in Saudi Aramco's employ, McDougall left Saudi Arabia to go on an employer-approved family trip. But his return to the country was foreclosed when, due to COVID-19, Saudi Arabia shut its borders to all but a few categories of travelers, of which he was not one. Nor did Saudi Arabia approve McDougall's request to enter. In June 2020, still unable to enter Saudi Arabia, McDougall was terminated because his services were "no longer needed."

McDougall subsequently sued Saudi Aramco in Saudi court for wrongful termination and prevailed. The final judgment, in the amount

equivalent to $61,179.84, reflected only his lost salary for the remaining term of his employment contract, from July 1, 2020, to October 31, 2020. Saudi Aramco appealed the judgment but was unsuccessful.

During the Saudi litigation, McDougall attempted to obtain his employment documents. These documents, he alleges, would have supplied the foundation for another claim against Saudi Aramco—for his lost employment benefits, including his medical, retirement, and life insurance benefits. According to McDougall, not only did he have a right to these documents under Saudi law, but Saudi Aramco's counsel also represented to McDougall's counsel in Saudi court that they would be turned over. Saudi Aramco allegedly failed to turn over these documents. Without them, McDougall says, he cannot make his case for his lost benefits, which allegedly amount to approximately $250,000.

McDougall then brought his document-recovery efforts stateside. He first sought a pre-suit deposition in Harris County District Court pursuant to Texas Rule of Civil Procedure 202. *See* TEX. R. CIV. P. 202. But his petition was denied. He then filed the present suit in Dallas County District Court, alleging (1) common law fraud; (2) fraud by nondisclosure; and (3) constructive fraud. In this suit, however, he no longer seeks the production of those documents. Instead, he seeks damages—in the amount of $250,000, in addition to treble damages—for the allegedly fraudulent withholding of those documents. Saudi Aramco timely removed the case to the Northern District of Texas.

Saudi Aramco then moved to dismiss under Federal Rules of Civil Procedure 12(b)(1), (2), and (5), arguing lack of subject-matter jurisdiction, lack of personal jurisdiction, deficient service of process, and *forum non conveniens*. The district court granted the motion, concluding that it lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act

("FSIA") and that neither the commercial-activity exception nor the expropriation exception applied. McDougall timely appealed.

## II

"We review a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) *de novo.*" *Flores v. Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019). "A district court may dispose of a motion to dismiss for lack of subject matter jurisdiction based 'on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Id.* (quoting *Robinson v. TCI/US W. Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)). Where, as here, the district court dismissed the case based on the complaint alone, we "accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to [the] plaintiff." *Burnett Specialists v. Cowen*, 140 F.4th 686, 693 (5th Cir. 2025).

## III

The FSIA "provides 'the sole basis for obtaining jurisdiction over a foreign state in [federal and state] courts.'" *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 257 (5th Cir. 2016) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 & n.2 (1989)). "It furnishes both the immunity itself, which applies to any 'foreign state,' and the only exceptions to that immunity." *Id.*; *see* 28 U.S.C. §§ 1602–11. If an exception applies, courts have jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim in personam . . . ." § 1330. But "[i]f no exception applies, there is no other basis for personal or subject matter jurisdiction over a foreign state." *Janvey*, 840 F.3d at 257 (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983)); § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States exception as provided in sections 1605 and 1607 of this chapter.").

4

No. 25-10619

A "foreign state," in turn, includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . . ." § 1603(a). An "agency or instrumentality of a foreign state" means an entity that is: (1) a separate legal person, corporate or otherwise; (2) an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof; and (3) neither a citizen of a U.S. state, as defined in §§ 1332(c) and (e), nor created under the laws of any third country. § 1603(b); *see also Janvey*, 840 F.3d at 258–59.

We apply a burden-shifting framework to determine subject-matter jurisdiction under the FSIA. First, the party claiming to be a foreign state "need only present a prima facie case that it is a foreign state." *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 (5th Cir. 2016). If it does so, it is "entitled to a presumption of immunity." *Janvey*, 840 F.3d at 257; *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The burden then shifts to the party opposing immunity to present evidence or, at the pleading stage, point to parts of the complaint that plausibly demonstrate that one of the exceptions to immunity applies. *Frank*, 842 F.3d at 367. If the party opposing immunity bears this burden, then the foreign state "ha[s] the ultimate burden of persuasion that the exception does not apply to [it] and that [it is] entitled to immunity." *Janvey*, 840 F.3d at 257–58.

## A

Here, the prima facie case is met. We have already recognized that "Saudi Aramco is a 'foreign state' for purposes of the FSIA." *Al-Qarqani v. Saudi Arabian Oil Co.*, 19 F.4th 794, 800. (5th Cir. 2021). And the parties do not dispute this. Saudi Aramco has therefore made its prima facie showing, and the burden shifts to McDougall to plead adequate facts to plausibly demonstrate that an exception applies.

No. 25-10619

McDougall contends two exceptions are met: the commercial-activity exception and the expropriation exception. The former states, in relevant part, that a foreign state is not entitled to jurisdictional immunity if "the action is based upon a commercial activity carried on in the United States by the foreign state."[1] § 1605(a)(2). The latter states, in relevant part, that a foreign state is not immune if "rights in property taken in violation of international law are in issue and that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." § 1605(a)(3).

These exceptions share the requirement that there be a "commercial activity carried on in the United States *by* the foreign state." *See* §§ 1605(a)(2), (3) (emphasis added). So we must first determine who, under the pleaded facts, carried on the commercial-activity in the United States and then determine whether that entity indeed constitutes a foreign state under the FSIA.

The first step is easy enough. McDougall pleads repeatedly that ASC carries on various commercial activities for Saudi Aramco. He alleges that ASC conducts "oil sales and refinement," "perform[s] research," and "recruit new employees from the United States and greater-Americas" on Saudi Aramco's behalf. And he further alleges that these activities are indeed

---

[1] To be sure, § 1605(a)(2) contains a total of three immunity-exception clauses. These clauses differ on the type of activity (commercial or not), the location of the activity (in the United States or not), and the actor (the foreign state or not) they require. But McDougall argues that his fraud claims against Saudi Aramco "are rooted in an employment relationship forged and managed through continuous *U.S.-based commercial conduct*" by ASC, such as its recruiting efforts. Since only the clause we highlight above requires a showing of a commercial activity in the United States, we construe his arguments as relying on that clause of the commercial-activity exception and analyze them as such.

6

"commercial." On appeal, too, he argues that ASC's U.S.-based commercial conduct is the basis for his suit.

The question then becomes whether ASC is a "foreign state" under the statute. As noted above, "the term 'foreign state' refers not only to the state itself, *viz.*, the 'body politic that governs a particular territory,' but also to its 'agenc[ies] or instrumentalit[ies].'"[2] *Janvey*, 840 F.3d at 258 (internal footnotes omitted). "An agency or instrumentality of a foreign state is a separate entity, 'corporate or otherwise,' that is either (1) majority owned by a foreign state or (2) an 'organ' of a foreign state."[3] *Id.* "There is a distinction between those agencies or instrumentalities that qualify because they are 'organs' of a foreign state and those that qualify because they are 'majority owned' by one." *Id.* at 258–59. "In some circumstances, however, an agency or instrumentality may be both and thus qualify as either." *Id.* at 259.

To qualify as a "majority owned" agency or instrumentality, "the foreign state *itself* [must] own[] a majority of the corporation's shares" or other ownership interest. *Id.* (quoting *Dole Food Co. v. Patrikson*, 538 U.S. 468, 477 (2003)). In other words, "[i]t is not an agency or instrumentality on the basis of majority ownership . . . if the 'foreign state does not own a majority of its shares but does own a majority of the shares of the corporate parent one or more tiers above the subsidiary." *Id.* (quoting *Dole Food Co.*, 538 U.S. at 471).

---

[2] "[T]he terms 'agency' and 'instrumentality[]' . . . are read together or treated interchangeably." *Janvey*, 840 F.3d at 258.

[3] As noted above, there is an additional requirement that the agency or instrumentality be "neither a citizen of a State of the United States as defined in section 1332(c) and (e) of [title 28], nor created under the laws of any third country." § 1603(b)(3). But we need not reach that requirement.

Here, Saudi Aramco is "majority-owned by [Saudi Arabia] itself and thus is an agency or instrumentality of" Saudi Arabia. *See Al-Qarqani*, 19 F.4th at 800. ASC, "however, does not qualify on that basis because it is not majority owned by [Saudi Arabia] directly, but by [Saudi Aramco]." *See Janvey*, 840 F.3d at 259. ASC is "merely a subsidiary of [Saudi Aramco], and that is not sufficient." *See id.*

ASC could still qualify as an agency or instrumentality if it is an "organ" of Saudi Arabia. "There is no clear test for determining whether an entity is an organ of a state," but "the following factors are useful": (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." *Id.*

McDougall has not pleaded *any* facts that would allow us to conclude that any one of these factors is met. By failing to do so, he has failed to carry his burden of plausibly demonstrating that one of the exceptions to immunity applies. *See Frank*, 842 F.3d at 367. And therefore, under these pleaded facts, ASC is neither an organ nor majority-owned agency or instrumentality of Saudi Arabia.

\* \* \*

McDougall has not demonstrated that ASC is an agency or instrumentality of Saudi Arabia—essential elements to the two exceptions he contends are satisfied. Accordingly, the district court did not err in concluding that the exceptions are not met and that the FSIA confers immunity on Saudi Aramco here. We need not reach the other elements of the exceptions.

**B**

McDougall raises one additional point of error regarding the district court's treatment of the commercial-activities exception. He argues that the district court "committed reversible error by applying a minimum contacts analysis to determine subject-matter jurisdiction under the Foreign Sovereign Immunities Act." As the argument goes, the Supreme Court in *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572 (2025), held that the FSIA does not impose a minimum-contacts requirement, but "[i]n direct contravention of that standard, the [d]istrict [c]ourt here evaluated jurisdiction by searching for the 'particular conduct that constitutes the gravamen of the suit' and where that conduct occurred."

This argument misapplies *CC/Devas* and misunderstands the district court's decision. To start, *CC/Devas* dealt with an entirely different subsection of the FSIA from the one at issue here—§ 1330(b) (the personal jurisdiction subsection), not § 1330(a) (the subject-matter jurisdiction subsection). *See* 145 S. Ct. at 1579–82. It held only that, under § 1330(b), "personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'" *Id.* at 1580. It did not speak to how to evaluate whether an exception to immunity applies to confer *subject-matter* jurisdiction to federal courts. Nor did the district court even purport to decide the issue of personal jurisdiction or undertake a minimum contacts analysis; the words "minimum contacts" do not appear once in the district court's opinion.

More fundamentally, the district court was in fact *required* to "search[] for the 'particular conduct that constitutes the gravamen of the suit.'" *See Sachs*, 577 U.S. at 35. Indeed, the Supreme Court has instructed that, to determine what the action is "based upon" under the commercial-

activities exception, courts must consider the "particular conduct that constitutes the gravamen of the suit." *Id.*

McDougall is correct that the district court searched for such conduct. We thus decline to fault the district court for following the Supreme Court's express instructions.

## IV

For the foregoing reasons, we AFFIRM the judgment of the district court.